## In re CENDANT CORPORATION LITIGATION.

### No. CIV.A. 98–1664.

United States District Court,
D. New Jersey.

July 27, 1999.

Max Berger, Daniel L. Berger, Jeffrey N. Leibell, Gerald H. Silk, Bernstein Litowitz Berger & Grossmann LLP, New York City, Leonard Barrack, Jeffrey W. Golan, Leslie B. Molder, Barrack, Rodos & Bacine, Philadelphia, PA, Lead Counsel for Plaintiff Class.

Roger W. Kirby, Kirby McInerney & Squire, LLP, New York City, Lead Counsel for the Prides Class.

Herbert J. Stern, Stephen M. Greenberg, Joel M. Silverstein, Stern & Greenberg, Roseland, NJ, James G. Kreissman, Michael J. Chepiga, Jacob S. Putman, Lauren J. Rosenblum, Simpson Thacher & Bartlett, New York City, for HFS Defendants.

Steven S. Radin, Sills Cummis Zuckerman Radin Tichman Epstein & Gross, Newark, NJ, Greg A. Danilow, Timothy E. Hoeffner, Timothy A. Greensfelder, Weil, Gotshal & Manges LLP, New York City, Dennis J. Block, Howard Hawkins, Cadwalader, Wickersham & Taft, New York City, for Christopher K. McLeod and the CUC Defendants.

Natalie M. Hiott–Levine, Dennis P. Orr, Scott T. Nonaka, Mayer, Brown & Platt, New York City, Caryn Jacobs, Alan N. Salpeter, Michele Odorizzi, Mayer, Brown & Platt, Chicago, IL, Kathryn A. Oberly, Robert G. Cohen, William P. Hammer, Jr., Ernst & Young LLP, New York City, for Defendant Ernst & Young LLP.

OPINION

WALLS, District Judge.

## I. Introduction

This matter is before the Court on the motions of the HFS defendants, the CUC defendants, Christopher K. McLeod, and Ernst & Young to dismiss Lead Plaintiffs' complaint. With the exception of Ernst & Young's motion to dismiss the § 10(b) and Rule 10b–5 claims against it for stock purchases made after April 15, 1998, defendants' motions to dismiss the complaint are denied.

## II. Background

Cendant Corporation ("Cendant") was formed by the merger of CUC International, Inc. ("CUC") and HFS Incorporated ("HFS") on December 17, 1997. CUC was the surviving corporation and it was renamed "Cendant" after the merger. Holders of HFS common stock were issued shares of CUC common stock pursuant to a Registration Statement dated August 28, 1997 ("Registration Statement") and a Joint Prospectus. (Am.Compl.¶ 33.) Because CUC was the surviving corporation, CUC shareholders did not exchange their stock as part of the merger.

On March 31, 1998, Cendant filed its Form 10–K· Annual Report with the SEC including its 1997 financial statements. Two weeks later, after the close of the stock market on April 15, 1998, Cendant announced that it had discovered accounting irregularities in certain former CUC business units. As a result, it announced that it expected to restate its annual and quarterly financial statements for 1997 and possibly for earlier periods as well. The next day, Cendant's stock fell 47%, from $35 ⅝ to $19 ⅟₁₆ per share. Shareholder suits were then filed in this and other districts against Cendant, its officers and directors, and other parties including

Ernst & Young LLP ("E & Y"). E & Y had acted as CUC's independent public accountant from 1983 through the formation of Cendant, and afterwards, audited the financial statements of Cendant Membership Services ("CMS"),[1] a wholly owned subsidiary of Cendant, for the year ended December 31, 1997. These financial statements of CMS were consolidated into Cendant's financial statements and included in Cendant's Form 10–K for the 1997 fiscal year, filed with the SEC. On July 14, 1998, Cendant announced that it would restate CUC's annual and quarterly financial statements for 1995 and 1996 as well as 1997. Following this announcement, Cendant's stock fell by another 9 % to $15 ⅟₁₆ per share. Finally, on August 28, 1998, Cendant filed with the SEC a report prepared by Willkie Farr & Gallagher, the law firm it had engaged to perform an independent investigation, which disclosed, among other things, that Cendant would restate its 1995, 1996, and 1997 financial statements by approximately $500 million. Cendant's stock then fell by 11% to $11 ⅝ on August 31, 1998, the first trading day after Cendant's disclosure of the financial report. Lead Plaintiffs allege that Cendant's market capitalization dropped from $30.4 billion before the April 15, 1998 disclosure to $9.9 billion on August 31, 1998, for a loss of $20.5 billion.

This Court consolidated all the shareholder suits against Cendant, with the exception of a shareholder derivative action, through a Consolidation Order dated May 29, 1998.[2] On September 8, 1998, this Court appointed the California Public Employees' Retirement System, the New York State Common Retirement Fund and the New York City Pension Funds ("the CalPERS group") collectively as the Lead Plaintiffs for all Cendant shareholders other than holders of Feline Prides derivative

---

1. Simultaneously with the Merger, all of the businesses formerly operated by CUC and all of CUC's assets were transferred to CUC Membership Services, Inc. On December 29, 1997, CUC Membership Services, Inc.

changed its name to Cendant Membership Services.

2. Some actions were subsequently deconsolidated and some later-filed actions were not consolidated.

products ("Prides"). Welch & Forbes was selected as Lead Plaintiff for the Prides holders. The Court then conducted an auction to determine the lowest qualified bidders to represent the Cendant share-holders and the Prides holders as counsel. After the auction, the Court approved the Lead Plaintiffs' choice of counsel and appointed Kaufman Malchman Kirby & Squire, LLP[3] as Lead Counsel for the Prides holders and Bernstein Litowitz Berger & Grossman LLP and Barrack, Rodos & Bacine as Lead Counsel for the remaining Cendant shareholders. (October 9, 1998 and October 13, 1998 Orders.)

Following the selection of lead plaintiff and approval of lead counsel, on December 14, 1998, the CalPERS group filed an amended and consolidated class action complaint on behalf of all persons and entities who purchased or acquired Cendant or CUC publicly traded securities, excluding Prides, during the period of May 31, 1995 through August 28, 1998 (the "class period"), and were injured thereby. Concurrently, the CalPERS group filed a motion for class certification which was granted by this Court on January 27, 1999. The complaint named as defendants Cendant, E & Y, and individual officers and directors of Cendant, CUC, and HFS. The complaint alleges that defendants Walter Forbes, E. Kirk Shelton, Christopher K. McLeod, Cosmo Corigliano, and Anne M. Pember were officers of CUC before the merger, reviewed or were aware of the false and misleading statements alleged in the complaint, and "were in a position to control or influence their contents or otherwise cause corrective or accurate disclosures to have been made." (Am. Compl.¶¶ 16–17.) The complaint asserts that the following defendants, together with defendants Walter Forbes, Shelton, and McLeod, were members of CUC's Board of Directors before the merger, signed the Registration Statement, and were named therein as directors of Cendant upon the completion of the merger:

Burton C. Perfit, T. Barnes Donnelley, Stephen A. Greyser, Kenneth A. Williams, Barlett Burnap, Robert P. Rittereiser, and Stanley M. Rumbough, Jr. (Id. at ¶ 18.) All of the named officers of CUC are known collectively as the "CUC individual defendants." The following defendants, except Scott Forbes, were directors of HFS before the merger and were named in the Registration Statement, as directors of Cendant upon the completion of the merger: Henry R. Silverman, John D. Snodgrass, Michael P. Monaco, James E. Buckman, Scott E. Forbes, Steven P. Holmes, Robert D. Kunisch, Leonard S. Coleman, Christel DeHaan, Martin L. Edelman, Brian Mulroney, Robert E. Nederlander, Robert W. Pittman, E. John Rosenwald, Jr., Leonard Schutzman, and Robert F. Smith (collectively, the "HFS individual defendants"). Scott Forbes served as the Senior Vice President–Finance of HFS and then Cendant from August 24, 1993 to April 15, 1998, and has been the Executive Vice President and Chief Accounting Officer of Cendant since April 15, 1998.

Plaintiffs claim that defendants made several materially false and misleading statements during the class period. Plaintiffs allege that a number of CUC and Cendant's filings with the SEC from June, 1995 through April, 1998 were materially false and misleading as were their press releases from May 31, 1995 through June 2, 1998 in which they announced their quarterly and annual earnings. (Am. Compl.¶¶ 66–67.) These press releases and SEC filings, according to plaintiffs, contained or incorporated by reference Cendant and CUC financial statements that were not prepared in conformity with Generally Accepted Accounting Principles ("GAAP") and contained other assertions that were materially false and misleading. (Am.Compl.¶¶ 68–82.) In particular, plaintiffs allege that Cendant and CUC overstated their revenues, net income, and op-

---

**3.** Kaufman Machman Kirby & Squire, LLP became Kirby McInerney & Squire, LLP, effective January 1, 1999.

erating income for the 1995, 1996, and 1997 fiscal years through various improper accounting practices. These included manipulation of merger reserves (reserves created which consist of the anticipated future costs of a business combination), irregular revenue recognition practices, CUC's improper accounting for membership cancellations, as well as a number of other improper accounting practices by CUC and its subsidiaries including Comp–U–Card. (Am.Compl.¶¶ 71–78.)

In addition, plaintiffs assert that the August 28, 1997 Registration Statement and the Joint Proxy Statement/Prospectus were materially false and misleading because of the financial statements incorporated by reference therein, misrepresentations contained in the Merger Agreement which was an appendix to the Joint Proxy Statement/Prospectus, and misrepresentations regarding the "due diligence" conducted by HFS in connection with the merger. (Am.Compl.¶¶ 86–102.) Plaintiffs maintain that E & Y failed to audit CUC's annual reports for 1995, 1996, and 1997 in accordance with Generally Accepted Auditing Standards ("GAAS") and review standards established by the American Institute of Certified Public Accountants (the "AICPA"). (Am.Compl.¶ 7.) Plaintiffs claim that E & Y's misrepresentations included: its assertions in its certification that it had audited CUC's financial statement in accordance with GAAS, that it had planned and performed those audits to obtain reasonable assurance about whether the financial statements were free of material misstatements, that in its opinion, CUC's financial statements presented CUC's financial position fairly, in conformity with GAAP, and that its audits provided a "reasonable basis" for its opinions. (Am. Compl.¶ 134.)

Plaintiffs claim that all defendants violated § 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, that Cendant violated § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), that defendants Walter Forbes, Shelton, McLeod, and Corigliano violated § 15 of the Securities Act, 15 U.S.C. § 77o, that defendants Cendant, Walter Forbes, Shelton, McLeod, Corigliano, Pember, Silverman, Snodgrass, Monaco, Buckman, Scott Forbes, and E & Y violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, that defendants Walter Forbes, Shelton, McLeod, Corigliano, Pember, Silverman, Snodgrass, Monaco, Buckman, and Scott Forbes violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), that defendants Walter Forbes, Shelton, McLeod, Corigliano, Silverman, Snodgrass, and Buckman violated § 20A of the Exchange Act, 15 U.S.C. § 78t–1, and that Cendant, the HFS individual defendants except Scott Forbes and the CUC individual defendants except Pember violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9.

Defendants Burnap, Donnelley, Greyser, Perfit, Rittereiser, and Rumbough (collectively, "CUC defendants"), move to dismiss the claims against them under § 11 of the Securities Act and § 14(a) of the Exchange Act on the grounds that Lead Plaintiffs have failed to plead fraud with particularity in violation of Fed.R.Civ.P. 9(b) and that they have failed to state a § 11 claim. Defendant McLeod moves to dismiss the complaint against him on the grounds that (1) Lead Plaintiffs have failed to plead fraud with particularity with regard to the §§ 11, 10(b), and 14(a) claims; (2) that they have failed to state a § 10(b) claim because they have failed to plead scienter; (3) that they have failed to state a claim for insider trading under § 20A; and (4) that they have failed to state §§ 11, 15, and 20(a) claims. All the HFS individual defendants move to dismiss the complaint against them on the grounds that (1) plaintiffs have failed to state a § 10(b) claim because they have not adequately plead scienter; (2) they have failed to state a § 14(a) claim because the HFS defendants reasonably relied on information provided by independent experts; (3) they have failed to state a claim under

362

§ 20(a) because they have not alleged culpable participation in a fraudulent scheme; (4) that they have not stated a § 20A claim against Silverman, Buckman or Snodgrass because they have failed to plead an underlying violation of the Exchange Act and they cannot seek damages under both § 10(b) and § 20A; and (5) that a § 10(b) cannot be based upon statements made by Cendant after April 15, 1998 in light of the Court's decision in *P. Schoenfeld Asset Management LLC v. Cendant Corp.*, 47 F.Supp.2d 546 (D.N.J.1999). E & Y moves to dismiss the complaint against it on the grounds that (1) Lead Plaintiffs have not stated a claim under § 10(b) for stock purchases made after Cendant's April 15, 1998 announcement; (2) they have not plead facts giving rise to a strong inference of scienter; (3) they have failed to state a § 10(b) claim for any CUC or Cendant securities other than common stock; (4) their §§ 10(b) and 11 claims should be dismissed because they have failed to plead fraud with particularity; (5) they have failed to state a § 11 claim for class members who were not eligible to vote on the merger; (6) all individual plaintiffs other than Lead Plaintiffs should be dismissed without prejudice because they are members of the class and there is no need for them to be named individually. Lead Plaintiffs oppose all of these motions. Lead Plaintiff for the Prides class also opposes the motions of E & Y and the HFS defendants to dismiss the post-April 15, 1998 claims.

## III. Discussion

### A. Motion to Dismiss Standard

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his/her allegations that will entitle him/her to relief, not whether that

person will ultimately prevail. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3d Cir.1998); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 at 299 (2d ed.1990).

### B. Section 11 of the Securities Act of 1933

McLeod and the CUC defendants move to dismiss the § 11 claims against them on the grounds that plaintiffs have failed to plead fraud with particularity in accordance with Fed.R.Civ.P. 9(b) and they (the defendants) have an affirmative defense because after a reasonable investigation, they had reasonable grounds to believe and did believe at the time the Registration Statement became effective that it was true and complete. Defendant E & Y moves to dismiss the § 11 claim against it because, it argues, plaintiffs have failed to plead fraud with particularity and the HFS shareholders who were not eligible to vote on the merger proposal do not have standing to bring a § 11 claim. Plaintiffs rejoin that their § 11 claim is based upon negligence, not upon fraud. They assert that § 11 does not require pleading or proof of fraudulent intent to establish a violation,

and even if it did, they have more than adequately satisfied the pleading requirements of Fed.R.Civ.P. 9(b). Plaintiffs also assert that § 11 does not require a plaintiff to have been eligible to vote on a merger; the only standing requirement for a § 11 claim is that the plaintiff exchanged his/her stock for stock in a merger.

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides for damages caused by a false or misleading registration statement. If the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," then "any person acquiring such security" may sue a number of enumerated individuals and entities. 15 U.S.C. § 77k(a). In particular, acquirers of the security may sue:

> (1) every person who signed the registration statement; (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner; (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; (5) every underwriter with respect to such security.

15 U.S.C. § 77k(a). Section 11 does not require a showing of intent or scienter. Unless it is proven that, at the time of the acquisition, the purchaser of the security knew of the untruths or omissions in the registration statement, all of the named persons and entities are liable to anyone who acquired the security. The person who acquired the security is not required to prove that s/he relied upon the untrue statements contained in the registration statement unless s/he acquired the security "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). Because the securities at issue here were not acquired after the release of such an earning statement, there is no reliance requirement for a § 11 claim.

### 1. The Applicability of § 9(b) to Plaintiffs' § 11 Claim

The CUC defendants, McLeod, and E & Y argue that plaintiffs have failed to state a § 11 claim because they have failed to plead fraud with particularity. The CUC defendants contend that the complaint "makes no effort whatsoever to plead particularized allegations of wrongdoing" as to each of them and that the complaint is replete with impermissible "group pleading" allegations. (CUC Mem. at 14–15.) Although the complaint alleges that defendants Perfit, Donnelley, and Greyser were members of CUC's Audit Committee, the CUC defendants argue that "the mere status of a director as a member of the Audit Committee is not sufficient to allege that the individual engaged in fraudulent conduct." (Id. at 15–16.) The CUC defendants also assert that the allegations that defendants Perfit, Donnelley, Burnap, and Rumbough sold CUC or Cendant stock during the class period do not provide particularized support for the fraud-based claims. Similarly, defendant McLeod contends that the complaint's assertions that he was an officer and director of CUC, Cendant, and certain other subsidiaries and that he had knowledge of two accounting practices which were not consistent with GAAP do not satisfy Rule 9(b)'s pleading standard. E & Y argues that it

is not enough for plaintiffs to identify false and misleading statements made by it; in addition, they must explain how and why those statements were false and misleading at the time they were made.

Plaintiffs have plead that they exchanged their HFS common stock for CUC common stock pursuant to the August 28, 1997 Registration Statement which contained material misstatements and omissions. (Am.Compl.¶¶ 113–114.) Christopher McLeod and each of the CUC defendants were directors of CUC at the time the Registration Statement was filed and each of them signed it. (Am. Compl.¶¶ 16–18, 116.) Plaintiffs claim that none of the individual CUC defendants "made a reasonable investigation or possessed reasonable grounds for the belief that the statements ... which were contained the Registration Statement, were true, were without omissions of any material facts, and were not misleading." (Am. Compl.¶ 117.) Plaintiffs claim that E & Y consented to the incorporation by reference of its unqualified audit report on CUC's 1995 and 1996 financial statements and to the reference to it under the caption "Experts" in the Registration Statement. (Am.Compl.¶ 133.) The financial statements were included in the Registration Statement in reliance upon E & Y's unqualified audit report, given upon the authority of E & Y as experts in accounting and auditing. (Am.Compl.¶ 133.) Plaintiffs assert that E & Y "did not make a reasonable investigation or possess reasonable grounds for the belief that the statements ... which were contained in the Registration Statement, were true, were without omissions of any material facts, and were not materially misleading." (Am.Compl.¶ 134.)

Plaintiffs have established a prima facie § 11 claim against the CUC defendants, McLeod, and E & Y. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean v. Huddleston*, 459 U.S.

375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). Plaintiffs have plead that the Registration Statement contained material misstatements and omissions and they have alleged that McLeod, the CUC defendants, and E & Y are within the class of individuals and entities who may be sued pursuant to 15 U.S.C. § 77k(a). "[N]either fraud nor mistake is a necessary element" of a § 11 claim. *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 288 (3d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Section 11 defendants may be held liable for a negligent misrepresentation or omission. *Shapiro*, 964 F.2d at 288 (citing *Herman & MacLean*, 459 U.S. at 382, 103 S.Ct. at 687). Where a § 11 claim is based on allegations of fraud, it is subject to the pleading requirements of Fed.R.Civ.P. 9(b). *Shapiro*, 964 F.2d at 288. However, where, as here, a § 11 claim is based on negligence, Rule 9(b) does not apply. *Cf. Shapiro*, 964 F.2d at 288 (specifically reserving decision on the issue of whether Rule 9(b) applies to claims that a defendant negligently violated § 11). Plaintiffs' theory of liability under § 11, that defendants had not "made a reasonable investigation or possessed reasonable grounds for the belief that the statements ... which were contained in the Registration Statement [ ] were true, were without omissions of any material facts, and were not misleading," sounds in negligence, not in fraud. (Am.Compl.¶¶ 117, 134.) Unlike the complaint in *Shapiro*, this complaint does not incorporate allegations of scienter and fraud into the § 11 claim. Rather, here the § 11 claim is plead before any of the other claims. Although the plaintiffs have plead that the defendants acted fraudulently in violation of § 10(b), the § 11 claim is limited to negligence. Plaintiffs have stated a claim for relief against McLeod, the CUC defendants, and E & Y.

## 2. The Affirmative Defense of McLeod and the CUC Defendants

Defendants McLeod and the CUC defendants argue that they have an affirma-

tive defense because, after a reasonable investigation, they had reasonable grounds to believe and did believe at the time the Registration Statement became effective that it was true and complete. They claim that the Report filed by Cendant with the SEC on August 28, 1998 provides the factual basis for their defense. Plaintiffs contend that this Court cannot determine whether these defendants have an affirmative defense to a § 11 claim on a motion to dismiss. Moreover, plaintiffs argue that although the Court may take judicial notice of the existence of the Report, it cannot accept as true the facts asserted therein.

Section 11(b) provides an affirmative defense to liability under § 11(a). Section 11(b) states that "no person, other than the issuer, shall be liable ... who shall sustain the burden of proof" that "he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading...." 15 U.S.C. § 77k(b)(3). The burden is on McLeod and the CUC defendants to prove this defense.

McLeod and the CUC defendants argue that dismissal of the § 11 claim against them on the basis of this affirmative defense is not premature because the affirmative defense is established by the pleadings and the August 28, 1998 Cendant Report incorporated therein. Plaintiffs insist that although they referred to the Report in their complaint, "the details contained in the Report, and any conclusions to be drawn from the comments contained in the Report about the participation of certain individuals in activities reported on, are not evidence." (Pl.'s Mem. in Opp. to McLeod at 26.) Plaintiffs argue that the Report cannot be considered on a motion to dismiss to prove the facts asserted therein.

▮ There is merit to plaintiffs' argument. All of the cases cited by the defendants in which § 11 claims were dismissed based on an affirmative defense were decided on motions for summary judgment. *See Laven v. Flanagan,* 695 F.Supp. 800, 811 (D.N.J.1988); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1421 (9th Cir. 1994); *In re Avant-Garde Computing Inc. Sec. Litig.,* 1989 WL 103625 (D.N.J.1989). The existence of the Report does not make it appropriate to consider the affirmative defense as a ground for dismissal at this stage in the litigation. Although the Report was filed with the SEC and referred to in the complaint, the Court may not consider the Report as proof of the facts asserted therein. *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996) (a court may consider documents which are required to be filed with the SEC and are actually filed with the SEC "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents")(citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2nd Cir.1991)); *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354–55 (7th Cir.1995) (the district court properly refused to take judicial notice of a corporation's Form 10–K to determine a fact in dispute—the number of corporate employees). The motions of the CUC defendants and McLeod to dismiss the § 11 claim against them are denied.

### 3. Whether the HFS Shareholder Without Voting Rights Have Standing to Sue under § 11

E & Y argues that only class members who were eligible to vote on the merger have standing to sue under § 11. They contend that those class members who exchanged HFS stock in the merger for CUC stock issued pursuant to the Registration Statement but were not eligible to vote on the merger do not have standing to sue. E & Y argues that a merger transaction requires a registration statement because it involves an offer to sell, but that

offer to sell occurs only with respect to those shareholders who are eligible to vote on the merger. Thus, only those shareholders with a right to vote on the merger acquired the securities at issue in response to an offer to sell. In support of this proposition, E & Y refers to SEC Rule 145, 17 C.F.R. § 230.145 which requires companies to file registration statements when they engage in business combinations which require shareholder approval. E & Y asserts that under *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) and *Shapiro*, 964 F.2d at 288, only purchasers who buy directly from the issuer or an underwriter in response to an offer to sell have standing to sue under § 11. By extension, E & Y argues that in the merger context, only those shareholders with a right to vote on the merger and who acquired the securities at issue in response to an offer to sell have standing. (E & Y's Mem. at 36–38.) E & Y argues that those investors who purchased HFS stock after August 18, 1997 (the record date) but before the merger was effected in December, 1997, do not have standing to sue for damages under § 11. (Id. at 38.) Plaintiffs counter that ownership as of the record date for voting purposes is not, and has never been, a prerequisite to a § 11 claim. (Pl.'s Mem. in Opp. to E & Y at 14.) They contend that SEC Rule 145 has nothing to do with who may sue under § 11 and that *Gustafson* and *Shapiro* did not limit § 11 claims to only those shareholders eligible to vote in a merger transaction.

▪ Section 11 does not require a shareholder to be eligible to vote on the merger through which she acquired the securities at issue. As stated, § 11 provides that in the case of a false or misleading registration statement, "any person acquiring such security" may sue a number of enumerated individuals and entities for damages. 15 U.S.C. § 77k(a). Neither the statute nor the case law requires the acquirer of the security to have voting rights. SEC Rule 145, upon which E & Y relies, requires companies to file registration statements when they engage in busi-

ness combinations which require shareholder approval; it does not define the class of persons who may bring a § 11 claim. Neither *Gustafson* nor *Shapiro* predicates standing to sue under § 11 on the right to vote in a merger transaction. In *Gustafson*, the Supreme Court announced that liability under § 12(a)(2) does not extend to a private, secondary transaction, on the theory that recitations in a purchase agreement are part of a prospectus. 513 U.S. at 571, 115 S.Ct. at 1068. *Gustafson* did not address § 11. In *Shapiro*, our Circuit has stated that § 11 claimants must allege that their shares are traceable to a false or misleading registration statement. Here, plaintiffs have alleged that their shares are traceable to a false or misleading registration statement because the plaintiff class acquired their securities directly from the issuer, CUC, through the merger on December 17, 1997 pursuant to the August 28, 1997 Registration Statement. Plaintiffs have adequately plead a § 11 claim against E & Y. E & Y has not cited a single case which limits standing to sue under § 11 to shareholders with voting rights. Nothing in § 11 or the relevant case law requires shareholders who acquired securities through a merger to have been eligible to vote on the merger, and this Court will not impose such a requirement. E & Y's motion to dismiss plaintiffs' § 11 claim against it is denied.

### C. Section 15 of the Securities Act

Defendant McLeod argues that plaintiffs have failed to plead the elements of a § 15(a) claim. McLeod contends that plaintiffs have not alleged facts "to support the conclusion that he exercised control over CUC or Cendant in general or, in particular, the financial reporting function where the alleged fraud occurred," and that they have not alleged that he culpably participated in the alleged wrongdoing. (McLeod Mem. at 27–28.) Plaintiffs counter that because they have set forth a viable § 11 claim, their § 15 claim is equally viable.

■ Section 15 of the Securities Act provides liability for "controlling persons" for violations of §§ 11 and 12 of the Securities Act. Under § 15:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l(a)(2) of this title [§§ 11 and 12] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. "Controlling person liability exists where the defendant has direct or indirect power over the management or policies of a person...." *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1281 (D.N.J.1990) (citing *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975)). In the determination of whether a person is a "controlling person" within the meaning of § 15, "heavy consideration" should be given "to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Bros.*, 527 F.2d at 890–891.

Plaintiffs have alleged that McLeod "was a controlling person of CUC within the meaning of Section 15 of the Securities Act." (Am.Compl.¶ 146.) They assert that "McLeod had the power and authority to cause CUC to engage in the wrongful conduct complained of ... by virtue of his position as CUC's Executive Vice President." (Id. at ¶ 147(c).) They further allege that McLeod "did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement or the Joint Proxy Statement/Prospectus were true and devoid of any omissions of material fact." (Id. at ¶ 148.) Plaintiffs

contend that McLeod is "liable jointly and severally with and to the same extent that Cendant, as successor to CUC, is liable under sections 11 and 12(a)(2) of the Securities Act to plaintiffs and the members of the Class...." (Id.)

■ Plaintiffs have adequately stated a § 15 claim against defendant McLeod. They have stated §§ 11 and 12 claims against Cendant and have alleged that McLeod was a member of CUC's and Cendant's senior management with access to and control over their financial information, and who participated in the underlying wrongful conduct alleged. (Am. Compl.¶¶ 16(c), 33, 72, 91, 147, 153.) Whether McLeod was actually a controlling person involves questions of fact "which cannot ordinarily be resolved at the pleading stage." *In re Chambers Development Sec. Litig.*, 848 F.Supp. 602, 618 (W.D.Pa.1994). McLeod's motion to dismiss plaintiffs' § 15 claim against him in Count VI of the complaint is denied.

### D. Section 10(b) of the Exchange Act

Defendant McLeod, the HFS defendants, and E & Y move to dismiss the § 10(b) and Rule 10b–5 claim against them because, they contend, plaintiffs have failed to plead fraud with particularity and they have failed to plead scienter. In addition, E & Y asserts that the § 10(b) claims brought on behalf of the purchasers of Cendant or CUC securities other than common stock must be dismissed. Both E & Y and the HFS defendants argue that plaintiffs' § 10(b) claims based on statements made by Cendant after April 15, 1998 must be dismissed in light of this Court's decision in *Schoenfeld*, 47 F.Supp.2d 546.

#### 1. Elements of § 10(b) Claim

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. Under § 10(b), it is unlawful to "employ, in connection with the purchase

or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. 15 U.S.C. § 78j(b). To implement the statute, the SEC enacted Rule 10b–5, violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). That Rule makes it unlawful: (1) "[t]o employ any device, scheme, or artifice to defraud," (2) "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," or (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The Supreme Court has held that standing to bring a private cause of action under Rule 10b–5 is limited to actual purchasers or sellers of securities. *Blue Chip Stamps,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539.

 This tort, although statutory in origin, sounds in the common law of fraud and deceit and retains, in modified form, the common law elements of duty, breach, causation, and damage. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 547 (5th Cir.1981) (10b–5 claim derived from common law action for deceit), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The plaintiff must prove knowledge by the defendant, an intent to defraud, misrepresentation or failure to disclose, materiality of the information and, injurious reliance by the plaintiff. *Thomas v. Duralite Co.,* 524 F.2d 577 (3d Cir.1975); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402 (3d Cir.1973). More precisely, these elements form the following test: To make a 10b–5 claim, a plaintiff must allege that the defendant made (1) a misstatement or an omission (2) of a material fact (3) with scienter (knowledge) (4) in

connection with the purchase or sale of a security (5) upon which plaintiff reasonably relied, and (6) that reliance proximately caused injury to the plaintiff. *Kline v. First Western Government Sec., Inc.,* 24 F.3d 480, 487 (3d Cir.), *cert. denied sub nom., Arvey, Hodes, Costello & Burman v. Kline,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *In re Phillips Petroleum Sec. Litig.,* 881 F.2d 1236, 1244 (3d Cir.1989) (citing *Angelastro v. Prudential–Bache Sec., Inc.,* 764 F.2d 939, 942–43 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985)).

### 2. Whether Plaintiffs Have Plead Fraud with Particularity and Scienter

 Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "The purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir. 1998). To satisfy Rule 9(b), plaintiffs must "plead with particularity the 'circumstances' of the alleged fraud." *Rolo,* 155 F.3d at 658. Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *In re Advanta Corp. Sec. Lit.,* 180 F.3d 525, 533 (3d Cir.1999) (quoting *DiLeo v. E & Y,* 901 F.2d 624, 627 (7th Cir.1990)). Plaintiffs "need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Rolo,* 155 F.3d at 658 (citing *Seville Indus. Mach. v. Southmost Mach.,* 742 F.2d 786, 791 (3d Cir.1984)). The Third Circuit has cautioned that courts should "apply the rule with some flexibility

and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo,* 155 F.3d at 658 (citing *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 99 (3d Cir. 1983)). A plaintiff who alleges securities fraud must "allege facts that give rise to a strong inference of scienter." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997). A plaintiff may establish this strong inference " 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " *Burlington,* 114 F.3d at 1418 (quoting *Acito,* 47 F.3d at 52).

 The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(2), specifically addresses the scienter requirement of a § 10(b) claim. It requires that a complaint which asserts a § 10(b) claim must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This scienter requirement mirrors that of the Second Circuit. *See, Advanta,* 180 F.3d 525 at 533; H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess. 41, 41 (1995), reprinted in 1995 U.S.C.C.A.N. 740, 740; S. Rep. 98, 104th Cong., 1st Sess. 15 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694. As the Third Circuit announced in *Advanta,* "Congress's use of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit." *Advanta,* 1999 WL 395997 at *7. To satisfy this pleading requirement, plaintiffs must state with particularity facts which show that defendants had both motive and opportunity to commit fraud or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Advanta,* 1999 WL 395997 at *8; *Burlington,* 114 F.3d at 1418; *Acito,* 47 F.3d at 52. Recklessness, in turn, involves "not merely sim-

ple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta,* 1999 WL 395997 at * 8 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)). Conscious behavior in this sense refers to "intentional fraud or other deliberate illegal behavior." *Advanta,* 1999 WL 395997 at * 8.

### a. Defendant McLeod

 Defendant McLeod argues that the plaintiffs' complaint fails to plead particularized allegations of wrongdoing as to him. He contends that plaintiffs' allegations that he was an officer and director of CUC, that he was aware of the allegedly improper accounting practices, and that he sold stock during the class period are not enough to satisfy Rule 9(b)'s pleading standard. McLeod also asserts that plaintiffs have not plead facts which give rise to a strong inference of scienter. McLeod's argument has no merit. Plaintiffs have more than adequately satisfied Rule 9(b)'s pleading standard and the scienter requirement with regard to their § 10(b) claim against McLeod.

Plaintiffs have alleged that McLeod, as a senior officer and director of CUC and Cendant, was involved in the day-to-day affairs of the company. During the class period, he was a senior executive officer and director of Cendant, an Executive Vice President of CUC, a member of its Board of Directors, and a member of CUC's "Office of the President" and reported directly to defendant Walter Forbes. (Am.Compl.¶ 16(c).) McLeod was also the Chief Executive Officer of CUC Software and President of the Comp–U–Card division of Cendant, the operations in which many of the accounting irregularities occurred. (Am. Compl.¶¶ 16(c), 153(u); Pls.' Mem. in Opp. to McLeod at 13–14.) Plaintiffs allege that McLeod "received Comp–U–Card's

annual budgets, reporting packages from Comp–U–Card and other subsidiaries, and all Projection Model schedules-which were among the very documents utilized to effectuate the fraud." (Pls.' Mem. in Opp. to McLeod at 14; Am. Compl. ¶¶ 153(g), (j) and (*l*).) Plaintiffs have also alleged that McLeod was aware of improper revenue recognition practices at Comp–U–Card but "took no action to correct the improper accounting." (Am. Compl.¶¶ 72(d), 153(k-l).)

McLeod contends that plaintiffs plead neither facts which constitute evidence of conscious misbehavior or recklessness nor facts which show that he had both motive and opportunity to commit fraud. This defendant argues that plaintiffs have never alleged that he participated in the accounting irregularities or that he ever knew that the accounting practices utilized by Cendant and CUC were improper. He claims that plaintiffs improperly base their allegations of fraudulent intent on the fact that he had access to various internal documents such as budgets and consolidated reporting packages.

Plaintiffs have alleged that McLeod had actual knowledge of the fraud and have plead facts which evidence conscious misbehavior or recklessness on the part of McLeod and which demonstrate that he had both motive and opportunity to commit fraud. Plaintiffs have charged McLeod with knowledge of the improper accounting practices of Cendant and CUC during the class period. They have declared that McLeod received Comp–U–Card's annual budgets as well as reporting packages from Comp–U–Card and subsidiaries and that he had knowledge of CUC's manipulation of merger reserves and of Comp–U–Card's irregular revenue recognition practices. (Am.Compl.¶¶ 72, 152, 153(j)-(*l*).) Plaintiffs assert that McLeod recognized that the 1997 income of Cendant Software was improperly increased through an unsupported $5.4 million entry of miscellaneous income, but took no action to correct the improper accounting. (Am. Compl.¶ 72(d).) McLeod's knowledge of these practices, alone, satisfies § 10(b)'s

scienter requirement. *See SEC v. U.S. Environmental, Inc.,* 155 F.3d 107, 112 (2d Cir.1998) (when a defendant acts with scienter, "his personal motivation for manipulating the market is irrelevant in determining whether he violated § 10(b)"). Moreover, plaintiffs have alleged facts which constitute recklessness on the part of McLeod at the very least. Plaintiffs assert that as one of Cendant's executive officers, "McLeod was responsible for the issuance of the false financial statements that form the core of plaintiffs' allegations." (Pls. Mem. in Opp. to McLeod at 16; Am. Compl. ¶¶ 19, 151.) Plaintiffs' allegations of McLeod's access to this financial information, his knowledge of the irregular accounting practices, and his failure to remedy the accounting irregularities constitute facts which demonstrate recklessness, if not conscious behavior. Plaintiffs have also alleged that McLeod, through his access to financial information and issuance of financial statements, had the opportunity to commit securities fraud. As for McLeod's motive, plaintiffs have alleged that he received a number of monetary and other benefits as a result of the Merger and that he received over $15.9 million from his stock sales during the class period. (Compl.¶¶ 16(c), 153(w).) Plaintiffs have plead sufficient facts to give rise to an inference that McLeod acted with scienter. McLeod's motion to dismiss the § 10(b) claim against him for failure to plead fraud with particularity and failure to allege scienter is denied.

### b. The HFS Defendants

The HFS management defendants—Silverman (Cendant's CEO), Snodgrass (Cendant's Vice Chairman and former President and Chief Operating Officer of HFS), Monaco (Cendant's Vice Chairman and CFO), Buckman (Sr. Exec. V.P. and General Counsel), and Scott Forbes (Sr.V.P.-Finance) contend that plaintiffs have failed to state a § 10(b) claim against them because they have failed to adequately plead scienter. The complaint charges these defendants with violations of § 10(b) "from

the date of the Merger through the end of the Class Period." (Am.Compl.¶¶ 157–158.) The complaint alleges that the HFS management defendants "knew or should have known that Cendant's reported financial results throughout the Class Period, as filed with the SEC and disseminated to the investing public were materially overstated and were not presented in accordance with GAAP, and that HFS had failed to conduct substantive due diligence in connection with the Merger, contrary to the representations in the Joint Proxy Statement/Prospectus." (Am.Compl.¶ 158.) Plaintiffs allege that each of the HFS management defendants, except Scott Forbes signed the August 28, 1997 Registration Statement which included false statements regarding their "due diligence," their recommendation and "fairness" representation, and the false CUC financial statements. (Pls.' Mem. in Opp. to HFS Defs. at 17.) After the Merger, Cendant, under the control of the five HFS management defendants, announced and issued the materially overstated financial statements on February 4, May 5, and August 13, 1998.(Id.)

The complaint is replete with allegations that the HFS management defendants had actual knowledge of the fraud, allegations of conscious misbehavior or recklessness on the part of the HFS management defendants, and alleged facts which demonstrate that the HFS management defendants had both motive and opportunity to commit fraud. First, plaintiffs charge that the HFS management defendants made a number of knowing misrepresentations in the Joint Prospectus and to the media about the due diligence HFS performed before it consummated the merger with CUC: Defendant Monaco represented that HFS routinely performed due diligence when scouting acquisition targets and that HFS customarily sampled a target company's journal entries to determine the significance of the adjustments made to the target's books and records. (Compl.¶ 94.) After the announcement of accounting irregularities, defendant Silverman stated on April 17, 1998 that HFS "did all the due diligence that one does when one buys a public company." (Id. at ¶ 95.) Yet, in an August 13, 1998 article in the Wall Street Journal, Silverman admitted that HFS's due diligence in connection with the Merger was "based almost entirely on public information audited by E & Y, CUC's auditor." (Id.) Plaintiffs contend that based on the HFS defendants' own admissions, they failed to conduct their regular method of due diligence, although they had claimed otherwise.

Moreover, paragraph 161 of the complaint lays out fifteen individual facts that create a strong inference of scienter on the part of the HFS management defendants. Among the allegations in that paragraph, plaintiffs assert that defendants Silverman, Snodgrass, and Buckman sold 3.6 million shares of Cendant common stock between December 17, 1997 and April 15, 1998, of which 3.1 million were sold between February 5, 1998 and April 7, 1998. (Am. Compl.¶ 161.) According to plaintiffs, the HFS management defendants knew or recklessly disregarded CUC's past accounting and reporting problems (due to irregular revenue and expense recognition policies, CUC made cumulative adjustments of $58.9 million in the year ended January 31, 1989) and past SEC-compelled accounting restatements (the SEC compelled CUC to amend its previously filed financial statements six times between October and December, 1991), failed to disclose these accounting irregularities in the Joint Prospectus, failed to perform its customary due diligence, and failed to retain Deloitte & Touche, its regular outside auditor, or any other accounting firm to perform the due diligence. (Am. Compl. ¶¶ 89–90, 161; Pls.' Mem. in Opp. to HFS Defs. at 20–21.) Plaintiffs also allege that although E & Y informed the Cendant Audit Committee on February 3, 1998 that CMS's income for January, 1997 was overstated by approximately $23 million, Cendant announced its 1997 year-end results on February 4, 1998, which included that overstatement. (Am.Compl.¶ 161.) Cendant released its materially misstated 1997 financial statement on February 4, 1997, at

a time when the HFS management defendants were Cendant's most senior officers. Plaintiffs assert that the HFS management defendants met several times between March 6, 1998 and March 10, 1998 to discuss a number of accounting irregularities and how to reverse $165 million of the Cendant merger reserve into income in 1998. (Am.Compl.¶ 161(h)-(k)).

■■ As said, for the purposes of a motion to dismiss, the allegations of a complaint are accepted as true. Plaintiffs have more than adequately plead facts that give rise to an inference of scienter. These facts demonstrate that the HFS management defendants had motive and opportunity to defraud the Cendant shareholders and constitute evidence of recklessness, if not conscious misbehavior, on the part of the HFS management defendants. The HFS management directors' motion to dismiss plaintiffs' § 10(b) claim against them for failure to adequately plead scienter is denied.

### c. E & Y

■■ E & Y moves to dismiss plaintiffs' § 10(b) claim against it based on Cendant securities purchases on or before April 15, 1998 because, it contends, plaintiffs have failed to allege facts that give rise to a strong inference that E & Y acted with scienter and they have failed to plead fraud with particularity. E & Y argues that the complaint has failed to plead that it had motive and opportunity to defraud the CUC and Cendant shareholders and has failed to plead facts which constitute evidence of recklessness or conscious misbehavior on its part. E & Y's arguments have no merit. Plaintiffs have adequately plead fraud and scienter.

Plaintiffs have plead facts which constitute evidence of recklessness if not conscious misbehavior on the part of E & Y. Plaintiffs have alleged that this defendant failed to discover that the operating income at CUC and CMS was overstated by $500 million and earnings per share overstated by 130% over a period of three years. They claim that E & Y's audits

were not performed in accordance with GAAS and that its unqualified audit reports, as included or incorporated by reference in CUC's and Cendant's annual and quarterly financial statements for 1995, 1996, and 1997 filed with the SEC, were materially false and misleading. (Am. Compl.¶ 166.) Plaintiffs further allege that E & Y, "with knowledge of the falsity and misleading nature of the statements contained in its unqualified audit reports, and in reckless disregard of the true nature of its audits," caused material misstatements to be included in materials filed with the SEC. (Am.Compl.¶ 168.) Plaintiffs claim that E & Y's audit of CMS's financial statements for 1997 and its audits of CUC's financial statements for 1995 and 1996 were not performed in accordance with GAAS. They assert that E & Y's "unqualified reports dated March 19, 1996, March 10, 1997 and February 3, 1998, issued in connection with those audits, as included in the 1995, 1996 and 1997 10-Ks, in which E & Y certified, *inter alia*, that its audits were performed in accordance with GAAS, were materially false and misleading." (Am.Compl.¶ 169.) Plaintiffs allege that E & Y "knew or recklessly disregarded that it had not performed its audits of CUC's 1995 and 1996 financial statements and its audit of CMS's 1997 financial statements in accordance with GAAS, and therefore, that its unqualified audit reports on CUC's and CMS's financial statements for 1995, 1996 and 1997 were materially false and misleading." (Am. Compl.¶ 170(a).) The complaint asserts that E & Y failed to obtain sufficient competent evidential matter to form a basis for its unqualified reports.

Paragraph 170 of the complaint provides a plethora of particularized factual examples of E & Y's failure to perform its audits in accordance with GAAS. Under GAAS, representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02 (1998); AU § 333.02

(1997). "The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements." AU § 326.16 (1998); AU § 326.15 (1997). Plaintiffs allege that E & Y "failed to obtain direct evidence in connection with CUC's and CMS's recording of revenue and elimination or reduction of expenses as a result of write-offs of merger reserves. Instead E & Y relied largely on management's representations. As a result, $108 million of those reserves were written off in 1997 directly to revenue without any conceptual basis under GAAP. Another $7 million of those reserves were used to offset expenses during the Class Period that were not related to the purpose of those reserves, without conceptual basis. E & Y failed to discover that all of those adjustments were unsupported by documentation." (Am.Compl.¶ 170(a)(i)(1).) Plaintiffs allege that "[n]o one from E & Y reviewed CUC's general ledgers or asked to see any post-closing journal entries." (Id.) According to plaintiffs, E & Y "did not have a sufficient understanding of Comp–U–Card's accounting procedures and systems, and did not perform sufficient testing to determine the appropriateness of the expenses reported." (Id. at ¶ 170(a)(i)(9).) As a result, E & Y failed to discover that Comp–U–Card deferred expenses but recognized revenue immediately. (Id. at ¶ 170(a)(i)(9).) Plaintiffs' allegations that E & Y failed to obtain direct evidence to support CUC's and Cendant's financial statements but relied instead on the representations of management evidences recklessness. Plaintiffs have alleged facts which give rise to a strong inference of scienter. E & Y's motion to dismiss plaintiffs' § 10(b) claim against it

for failure to plead fraud with particularity and failure to plead scienter is denied.

### 3. Section 10(b) Claims by Purchasers of Cendant Securities After April 15, 1998

The HFS defendants and E & Y argue that the § 10(b) claims of those plaintiffs who purchased Cendant securities after April 15, 1998 and those claims that are based upon statements after April 15, 1998 must fail in light of this Court's opinion in *Schoenfeld*, 47 F.Supp.2d 546. Plaintiffs argue that "*Schoenfeld* is distinguishable because, after April 15, 1998, Cendant issued new materially false and misleading quarterly financial results and financial statements on which investors were encouraged to rely, and did rely, to their detriment." (Pls.' Surreply Mem. at 1.) Lead Plaintiff for the Prides class asserts that notwithstanding *Schoenfeld*, Cendant's statements in the April 15, 1998 press release do not qualify for safe harbor treatment because they were made with knowledge that they were false. (Prides Pls.' Mem. at 9.)

The *Schoenfeld* plaintiffs represented a class of persons who purchased ABI stock between January 27, 1998 and October 13, 1998, after Cendant had announced its intention to acquire ABI. Those plaintiffs alleged that they purchased ABI stock in reliance on materially false and misleading information contained in Cendant's January 27, 1998 offer to purchase, its January 27, 1998 14D–1 Schedule and subsequent amended 14D–1 Schedules, and other documents and press releases related to Cendant's tender offer for ABI. In dicta,[4] this Court opined that because Cendant's April 15, 1998 press release "specifically cautioned the public that its previously issued financial statements and auditors' reports should not be relied upon," after April 15, 1998, plaintiffs could not, as a matter of

---

4. The section of this Court's *Schoenfeld* opinion which dealt with whether plaintiffs had reasonably relied on the defendants' statements was dicta. The Court had already found that the plaintiffs failed to state a

§ 10(b) claim because they had not charged that the defendants' alleged misrepresentations were made in connection with the purchase or sale of ABI securities.

law, have relied upon those statements and reports. *Schoenfeld*, 47 F.Supp.2d at 555–56. This Court also found that the defendants' statements in the April 15, 1998 press release "were forward-looking statements protected by the safe harbor provisions of the PSLRA and bespoke caution" because "they focused on the estimated amount of restated earnings which ultimately depended on the investigation by the audit committee." *Schoenfeld*, 47 F.Supp.2d at 557. The Court announced that the April 15 press release also "bespoke caution" because the cautionary language in the release "explicitly advised the public not to rely on any previous financial statements and that the full extent of the income and earnings statements would depend on the outcome of the audit committee's investigation." *Schoenfeld*, 47 F.Supp.2d at 557.

Plaintiffs challenge financial statements issued by Cendant after April 15, 1998; the *Schoenfeld* opinion held that purchasers of ABI could not reasonably rely after April 15, 1998, on the previous financial statements of Cendant. In particular, plaintiffs argue that Cendant's first quarter results for 1998 issued on May 5, 1998 and repeated in the Form 10–Q filed by Cendant with the SEC on May 15, 1998 were materially false and misleading and that Cendant has since admitted this. (Pls' Surreply Mem. at 3.) In the earnings release and financial statement, Cendant announced that it had, for the first quarter of 1998 "earnings per share of $.26 which exceeded Wall Street analysts consensus estimate of $.25 per share." (Id. at 2.) Plaintiffs assert that the April 15, 1998 release did not affect the 1998 financial statements because that release only applied to previously issued financial statements and auditors' reports. (Id. at 3.) Moreover, plaintiffs maintain that in the May 5, 1998 earnings release, Cendant represented that its first quarter 1998 results were "free of the historical accounting irregularities referred to in Cendant's April 15 admonition not to rely on the Company's previous financial statements." (Id.) According to plaintiffs,

Cendant's financial statements for the second quarter of 1998, released on August 13, 1998 and repeated in its Form 10–Q filed with the SEC on August 14, 1998, were false and misleading. (Id. at 4–5.) Plaintiffs aver that the second quarter 1998 earnings release and financial statement were overstated by $85.1 million. (Id. at 5.) Plaintiffs insist that like the first quarter results, the second quarter 1998 earnings release and financial statement were not subject to Cendant's April 15, 1998 warning because they were not "previously issued financial statements."

■ Plaintiffs' argument is sound. Cendant's April 15, 1998 press release cautioned the public not to rely upon Cendant's "previously issued financial statements and auditor's reports." It did not warn investors against reliance upon its 1998 quarterly earnings releases and financial statements. Indeed, in the April 15, 1998 press release, Cendant asserted that it expected "to meet or exceed the currently forecasted Wall Street consensus estimate of 25 cents per share for the first quarter of 1998. However, since 1997 earnings per share will be reduced about 11 to 13 cents, the Company anticipates that 1998 full-year earnings expectations will be reduced from current levels by approximately the same amount." The press release did not bespeak caution about the 1998 earnings releases and financial statements. Plaintiffs' § 10(b) claims based upon material misrepresentations and omissions in Cendant's earnings releases and financial statements for the first and second quarter of 1998 stand.

Moreover, the Prides plaintiffs argue that Cendant's statements in the April 15, 1998 press release were themselves false and misleading at the time made and therefore do not qualify for safe harbor treatment. The Prides plaintiffs contend that the following five assertions made then were false:

 a) Cendant has discovered "potential" accounting irregularities

b) among "certain" former CUC business units.

c) It expects to restate "annual and quarterly net income and earning per share" and "may" restate certain other prior periods.

d) Based on presently available information, the effect on 1997 income was expected to be between $100 and $115 million, or 11 to 13 cents per share.

e) Silverman's statement that "our businesses are very healthy and growing, but we're growing off a lower base."

(Prides Pls.' Mem. at 2.) The Prides plaintiffs concede that "to the extent that Cendant's April 15, 1998 release states the company is doing well and expects its growth to continue, it may qualify for safe harbor treatment." (Id. at 8.) However, these plaintiffs argue that the statements in the press release challenged are not forward-looking, and even if they were, they would not be entitled to safe harbor treatment because defendants knew them to be false at the time they were made. According to these Prides plaintiffs, the April 15, 1998 release is actionable because Cendant and the HFS defendants knew or were reckless in not knowing that those statements were false. The Prides plaintiffs argue that the accounting irregularities were certain, not "potential." (Id. at 5.) Those irregularities were not to be found among "certain" former CUC business units; rather, they permeated CUC. (Id.) It was a *certainty,* not a "possibility," that the financial statements for other periods, namely 1995 and 1996, would have to be restated. (Id. at 6.) That Cendant knew when it issued the April 15, 1998 press release that the reduction on 1997 income would be between $100 and $115 million, or 11 to 13 cents per share was false. The Prides plaintiffs argue that Casper Sabatino, CUC's vice president of accounting and financial reporting, and Mary Sattler, CUC's supervisor of financial reporting, knew, because they had made the entries, that CUC had falsely included income of $106 million in 1995,

$140 million in 1996, and $288 million in 1997. With the knowledge of this falsely reported income, Cendant knew that the effect on 1997 income would be substantially greater than $100 to $115 million. Finally, the Prides plaintiffs contend that Silverman knew that the "growth" of the business "was an illusion created by booking as revenues monies that might or might not be received, while deferring recognition of expenses that had unquestionably happened." (Id. at 7.)

Under the PSLRA, certain forward-looking statements qualify for safe harbor treatment and are protected from § 10(b) and Rule 10b–5 liability. *See* 15 U.S.C. § 78u–5. A "statement is forward-looking if, *inter alia,* it is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" *Advanta,* 1999 WL 395997 at *9 (quoting 15 U.S.C. § 78u–5(i)(1)(A)). A forward-looking statement will not qualify for safe harbor treatment if the plaintiff proves that it was either (1) made by a natural person (as opposed to a business entity) and "was made with actual knowledge by that person that the statement was false or misleading;" or (2) made by a business entity "by or with the approval of an executive officer of that entity" and "made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B).

Neither Cendant's statement that it had discovered potential accounting irregularities among certain former CUC business units nor Silverman's statement regarding the growth of the business was a forward-looking statement. However, neither of these statements was materially false or misleading; the Prides plaintiffs' challenge to these statements relates to semantics, not substance. The Prides plaintiffs contend that the two statements about expected restatements of previous financial statements were not forward-

looking because they related to historical facts, even if they were contingent upon the future results of an on-going investigation. They argue that even if these statements were forward-looking, they do not qualify for safe harbor protection because they were made with knowledge of their falsity. Regardless, Cendant's announcement that it "may" restate the financial statements of other periods was not a material misrepresentation; "may" in this context was highly suggestive and put the public on notice of other restatements. Cendant's language about other financial reports was sufficient to alert the average, prudent investor of possible irregularities. Whether Cendant's statement that, based on information available at that time, the effect on 1997 income was expected to be between $100 and $115 million, was a forward-looking statement is immaterial. Because the Prides plaintiffs have alleged evidence that Cendant knew that statement was false at the time made, it does not qualify for safe harbor treatment: Plaintiffs allege that the 1997 loss known then to Cendant was over $280 million.

The HFS defendants' motion to dismiss the § 10(b) claims of plaintiffs who purchased Cendant securities after April 15, 1998 and those claims based upon Cendant's April 15 press release and subsequently released earnings reports and financial statements is denied. The earnings releases and financial statements of the first and second quarters of 1998 were not protected by cautionary language in the April 15 press release. Plaintiffs have alleged evidence that Cendant's statement about the expected restatement of 1997 income was false and made with knowledge of its falsity. These statements are actionable and do not qualify for safe harbor treatment under the PSLRA. There are no wrongdoing allegations attributable to defendant E & Y after April 15, 1998. The motion of E & Y to dismiss any § 10(b) claim based upon purchases of Cendant securities after April 15, 1998 is granted.

### 4. § 10(b) Claims by Purchasers of Cendant Securities Other Than Common Stock

E & Y asserts that the § 10(b) claims brought on behalf of the purchasers of Cendant or CUC securities other than common stock must be dismissed. It argues that plaintiffs have not identified precisely which other CUC or Cendant securities were being publicly traded during the class period, have not alleged how or why the investors in these securities were allegedly defrauded or injured, and have not alleged that these other securities were traded on an open and developed market during the class period. Lead Plaintiffs counter that they have standing to represent purchasers of other securities whose claims arise from the same continuing fraud. Plaintiffs claim these other securities include "Cendant 5 7/8% Senior Notes due 12/15/98, which traded on the New York Stock Exchange; Cendant 4 3/4% Convertible Senior Notes due 2003, which traded on the New York Stock Exchange; Cendant 3% Convertible Subordinated Notes due 2002, which were dealer-traded at market prices that mirrored the market price of Cendant's common stock, and options on Cendant common stock." (Pls.' Mem. in Opp. to E & Y at 39.) Plaintiffs allege that all these publicly traded securities traded in open and efficient markets. (Id.)

There is no merit to Ernst & Young's argument. Lead Plaintiffs may represent purchasers of securities other than common stock because the claims of those purchasers arise from the same alleged fraud as the claims of the common stock purchasers. Where the claims of absentee class members arise out of the same basic allegations of fraud as those of the lead plaintiff, the lead plaintiff may adequately represent the interests of those absentee class members. *See, e.g., In re Prudential,* 148 F.3d 283, 313 (3d Cir.1998) (class representatives with claims different from absent class members were adequate class representatives because the "crux" of

the class action was the scheme to defraud); *Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391, 396 (D.N.J.1996). Lead Plaintiffs have identified a number of the other securities purchased by members of the class and have alleged that these securities traded in open and efficient markets. E & Y's motion to dismiss the claims of class members who purchased securities other than common stock is denied.

### E. Section 14(a) and Rule 14a–9

The HFS defendants, the CUC defendants, and McLeod move to dismiss plaintiffs' claims under § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a–9, 17 C.F.R. § 240.14a–9. The HFS defendants argue that these claims against them are based on misrepresentations which arose from inaccuracies in CUC's financial statements. The HFS defendants contend that those financial statements were audited by E & Y and they were entitled to rely on the opinions of E & Y as experts. The CUC defendants and McLeod argue that plaintiffs' § 14(a) claim fails to plead fraud with particularity.

"The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that '(f)air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *J.I. Case Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964) (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess., 13). Section 14(a) makes it "unlawful" to solicit proxies in contravention of SEC rules. 15 U.S.C. § 78n(a). SEC Rule 14a–9 prohibits solicitations "containing any statement which ... is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading...." 17 C.F.R. § 240.14a–9. "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if ... he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970). To state a claim under § 14(a), "a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *General Electric Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3d Cir.1992) (quoting *Mills*, 396 U.S. at 385, 90 S.Ct. at 622). Section 14(a) is more analogous to § 11 of the Securities Act than to § 10(b) of the Exchange Act, and the proper standard of liability under § 14(a), as under § 11, is negligence. *Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 777 (3d Cir.1976). This standard of liability applies even to outside non-management directors. *Gould*, 535 F.2d at 777.

Here, plaintiffs have alleged that the Joint Proxy Statement/Prospectus was materially misleading because "it materially misstated CUC's financial results throughout the Class Period, CUC's compliance with the Merger Agreement, and the substantive financial due diligence performed by HFS in connection with the Merger." (Am.Compl.¶ 199.) Plaintiffs assert that the HFS defendants, except for Scott Forbes, and all the CUC defendants, except Pember, "knew, at the time they issued, or caused HFS and CUC to issue, the Joint Proxy Statement/Prospectus, that it was materially false and misleading, or acted recklessly or negligently in distributing, or causing HFS and CUC to distribute, the Joint Proxy Statement/Prospectus containing the false and misleading statements and omissions." (Id. at ¶ 201.) Plaintiffs allege that they "relied to their detriment on the false information

contained in the Joint Proxy Statement/Prospectus when making their investment decision and casting their votes." (Id.) Plaintiffs state further that they and the other members of the class "who exchanged their HFS common stock for CUC common stock pursuant to the Joint Proxy Statement/Prospectus have been damaged by the wrongful conduct of Cendant," the HFS defendants, and the CUC defendants. (Id. at ¶ 202.)

■ Plaintiffs have stated a § 14(a) claim. They have alleged that the defendants acted negligently in the issuance of a proxy statement which contained a material misrepresentation, that this proxy statement caused them injury, and that the proxy solicitation itself was an essential link in the transaction. The HFS defendants' argument that they are immune from liability because they were entitled to rely upon E & Y's expert evaluation of the financial statements is an affirmative defense which requires a factual inquiry inappropriate to a motion to dismiss. The argument of McLeod and the CUC defendants fails because a § 14(a) claim requires only a showing of negligence, not fraud. Because plaintiffs have alleged that defendants acted negligently, they need not plead fraud at all, let alone fraud with particularity. The motions of all these defendants to dismiss plaintiffs' § 14(a) claim against them in Count XIV of the amended complaint are denied.

**F. Section 20A of the Exchange Act**

The HFS defendants and McLeod move to dismiss plaintiffs' insider trading claim under § 20A of the Exchange Act. The HFS defendants argue that plaintiffs have failed to plead an underlying violation of the Exchange Act, or that if they have, plaintiffs cannot seek damages under both § 10(b) and § 20A. Defendant McLeod contends that plaintiffs have failed to plead fraud with particularity.

■ Section 20A of the Exchange Act provides that any person who violates any other provision of the Exchange Act through the purchase or sale of any securi-

ty while in the possession of material nonpublic information is liable to any person who traded contemporaneously with the insider. 15 U.S.C. § 78t–1; *Advanta*, 1999 WL 395997 at * 15. Section 20A provides an alternative remedy for plaintiffs who traded contemporaneously with a corporate insider. Damages under § 20A are limited to "the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. § 78t–1(b). To assert a viable § 20A claim, a plaintiff must plead a predicate violation of the Exchange Act or its rules and regulations. *Advanta*, 180 F.3d at 541 (citing *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir.1994)). A plaintiff must allege: "(1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Exchange Act." *In re Advanta Corp. Sec. Litig.*, No. 97–CV–4343, 1998 WL 387595 at * 9 (E.D.Pa. July 9, 1998), *aff'd*, 180 F.3d 525 (3d Cir.1999).

As determined, plaintiffs have stated a claim under § 10(b) of the Exchange Act against the HFS defendants and McLeod. Accordingly, they have plead a predicate violation of the Exchange Act. The HFS defendants' argument that plaintiffs' § 20A claim should be dismissed because plaintiffs cannot seek recovery under both § 20A and § 10(b) of the Exchange Act fails. Section 20A provides an alternative remedy—if the § 10(b) claim of those plaintiffs who traded contemporaneously with the HFS defendants fails, then those plaintiffs may seek recovery under § 20A if they can establish a predicate violation of the Exchange Act. The HFS defendants' motion to dismiss plaintiffs' § 20A claim against them in Count XIII is denied.

■ Plaintiffs have also stated a § 20A claim against defendant McLeod. They have alleged that McLeod sold $15.9 million worth of stock contemporaneously

with plaintiffs' trading during the Class Period while he was a senior officer and director of CUC or Cendant and in possession of material nonpublic information. Plaintiffs have attached detailed Schedules to the complaint which list the dates on which the plaintiffs purchased CUC and Cendant common stock and those on which McLeod and other defendants sold their CUC and Cendant common stock. In particular, plaintiffs allege that on February 21, 1996, defendant McLeod sold 367,223 shares of CUC stock for over $12.99 million while the New York City Pension Funds purchased CUC stock on February 21, 22, and 23, 1996. (Am. Compl., Schedule C at 3, Schedule A at 10, 16, and 23.) Defendant McLeod's motion to dismiss plaintiffs' § 20A claim against him in Count XIII is denied.

### G. Section 20(a) of the Exchange Act

The HFS defendants and McLeod move to dismiss plaintiffs' claim under § 20(a) of the Exchange Act against them. The HFS defendants argue that plaintiffs have failed to allege culpable participation by them in a fraudulent scheme. McLeod contends that plaintiffs have not alleged facts "to support the conclusion that he exercised control over CUC or Cendant in general or, in particular, the financial reporting function where the alleged fraud occurred," nor that he culpably participated in the alleged wrongdoing. (McLeod Mem. at 27–28.)

Section 20(a) creates liability for "controlling persons" in a corporation, 15 U.S.C. § 78t(a), and imposes joint and several liability upon anyone who "controls a person liable under any provision of" the Securities Exchange Act of 1934. To maintain a claim under § 20(a), the plaintiffs must establish (1) an underlying violation by a controlled person or entity, (2) that the defendants are controlling persons, and that they were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Rochez Brothers,* 527 F.2d at 885 (quoting *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973)).

Plaintiffs have plead underlying violations of §§ 10(b) and 14(a) of the Exchange Act by Cendant, the controlled entity. They have alleged that McLeod and the HFS defendants acted as "controlling persons" of Cendant within the meaning of § 20 of the Exchange Act. (Am. Compl.¶¶ 183, 186.) They maintain that McLeod "had the power and authority to cause CUC and Cendant to engage in the wrongful conduct complained of herein by virtue of his position as Executive Vice President and Member of the Office of the President of CUC, and as Chief Executive Officer of Software and Executive Vice President of Cendant." (Id. at ¶ 184(c).) Plaintiffs allege that each of the HFS defendants "had the power and authority to cause Cendant to engage in the conduct alleged" in the complaint by virtue of their positions at Cendant: Silverman as President and Chief Executive Officer, Snodgrass as Vice Chairman, Monaco as Vice Chairman and Chief Financial Officer, Buckman as Senior Executive Vice President and General Counsel, and Scott Forbes as Executive Vice President and Chief Accounting Officer. (Id. at ¶ 187.) Plaintiffs have plead that the HFS defendants failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in Cendant's SEC filings and other public statements issued during the class period were true and free of any omissions of material fact. (Id. at ¶ 188.)

A § 20(a) claim has been asserted against the HFS defendants and McLeod. Plaintiffs have plead that Cendant, as the controlled entity, violated §§ 10(b) and 14(a) of the Exchange Act. They have alleged that McLeod and the HFS defendants were controlling persons within the meaning of § 20. Furthermore, they have plead that McLeod and the HFS defendants participated in the underlying fraud. The ultimate determination of whether defendants were controlling persons involves questions of fact not to be resolved at the pleading stage of this litigation. The mo-

tions of McLeod and the HFS defendants to dismiss the § 20(a) claims against them in Counts XI and XII are denied.

### H. E & Y's Motion to Dismiss All Plaintiffs Other Than Lead Plaintiffs

E & Y moves to dismiss all plaintiffs except Lead Plaintiffs from this action without prejudice. The complaint names seventy-three plaintiffs in addition to Lead Plaintiffs. E & Y contends that these other plaintiffs should be dismissed because if they are allowed to continue in the action, "they would be entitled to act like parties: to appear at court hearings and depositions, to file papers, to participate in settlement negotiations and the like." (E & Y Mem. at 39.) This, argues E & Y, would be unmanageable and "directly contrary to the letter and spirit of Rule 23 and the lead plaintiff provisions of the PSLRA." (Id.) E & Y maintains that if these other plaintiffs do not expect to play any further role in this litigation, their inclusion in the complaint as named plaintiffs serves no purpose. (Id. at 40.)

Lead Plaintiffs respond that E & Y's argument "is truly silly." (Pl.'s Mem. in Opp. to E & Y at 39.) Lead Plaintiffs are correct. The other plaintiffs do not and will not make this litigation unmanageable because this Court has appointed Lead Plaintiffs and Lead Counsel to manage this litigation. That seventy-three other parties chose to continue in this case as named plaintiffs is of no moment. E & Y's motion to dismiss the plaintiffs other than Lead Plaintiffs from this action is denied.

### IV. Conclusion

E & Y's motion to dismiss plaintiffs' § 10(b) and Rule 10b–5 claims based on stock purchases made after Cendant's April 15, 1998 announcement is granted. All of the remaining motions to dismiss the complaint are denied.

SO ORDERED.

### ORDER

This matter is before the Court on the motions of the HFS defendants, the CUC defendants, Christopher K. McLeod, and Ernst & Young to dismiss Lead Plaintiffs' complaint. The Court having heard oral argument on July 8, 1999, having considered the submissions of the parties, and for good cause shown,

It is on this day of July, 1999,

ORDERED that the motion of Ernst & Young to dismiss plaintiffs' § 10(b) and Rule 10b–5 claims against it for stock purchases made after April 15, 1998 is granted;

ORDERED that defendants' remaining motions to dismiss the complaint are denied.