## In re CENDANT CORPORATION SECURITIES LITIGATION.

**This document relates to Stewart v. Cendant Corporation.**

**Civ No. 98–1664(WHW).**

United States District Court, D. New Jersey.

Nov. 1, 1999.

J. Daniel Sagarin, Margaret E. Haering, Hurwitz & Sagarin LLP, Milford, CT, for Plaintiff.

Carl Greenberg, Michael Rosenbaum, Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, Samuel Kadet, Skadden, Arps, Slate Meagher & Flom LLP, New York City, for Cendant Corp. and Cendant Capital I.

## OPINION

WALLS, District Judge.

Defendant Cendant Corporation moves to dismiss the complaint of Gregory Stewart. Having heard oral argument, the Court grants Cendant's motion.

### Factual Background

From October 1985 until December 1997, plaintiff Gregory Stewart was employed by HFS, Inc. ("HFS") as Executive Vice President. In December 1997, HFS merged with CUC, Inc. to form Cendant Corporation ("Cendant"). As a result of the merger, Stewart's HFS stock options, acquired as an HFS employee, were converted into 48,062 Cendant stock options with a strike price of $23.88 per share. Stewart had up to one year after the end of his employment to exercise these options. In February 1998, Cendant informed Stewart that his employment would be terminated as of April 1998.

April 1998 was a busy month for both Cendant and Mr. Stewart. After the close of trading on April 15th, Cendant an-

nounced that it had discovered "potential accounting irregularities" in some of its former CUC units. The company disclosed that it expected to restate its financial statements for 1997 and possibly for earlier periods as well. The next day, Stewart received a letter, addressed to all employees, from Cendant's Chief Executive Officer ("April 16 letter") which stated that the "potential accounting irregularities" have "no material effect upon the performance of our businesses." Stewart also participated in a telephone conference call on the same day, the purpose of which was to inform senior management about the accounting problems ("April 16 call"). During the call, Richard Smith, president of Cendant's Real Estate Division, stated that the problems would be resolved without significant long-term effects. Cendant's stock price closed at $19 ¹⁄₁₆ per share on April 16, approximately $4.00 below the strike price of Mr. Stewart's stock options.

The following day, April 17, 1998, with regard to his termination, plaintiff signed an Agreement and General Release ("Release"). Greenberg Aff. Ex. 2. The Release contains a Connecticut choice-of-law clause. Cendant agreed to pay Stewart a lump sum severance payment of $185,000. In exchange for the severance payment, Stewart agreed to release Cendant from:

> any and all actions or causes of action, suits, claims, charges, complaints, promises and contracts (whether oral or written, express or implied from any source), whatsoever, in law or equity, which Recipient may now have or hereafter can, shall or may have against the Company, including all unknown,undisclosed and unanticipated losses, wrongs, injuries, debts, claims or damages to Recipient, for, upon, or by reason of any matter, cause or thing whatsoever including, but not limited to, any and all matters arising out of his employment by the Company and the cessation of said employment and including, but not

> limited to, any claims for salary, bonuses, severance pay, or vacation pay ...

Release ¶ 5. Further, in the Release, Stewart acknowledged (in large print):

> THAT HE IS NOT RELYING ON ANY OTHER REPRESENTATIONS, WRITTEN OR ORAL, NOT SET FORTH IN THIS DOCUMENT, HAVING ELECTED TO EXECUTE THIS AGREEMENT AND GENERAL RELEASE TO FULFILL THE PROMISES SET FORTH HEREIN, AND TO RECEIVE THEREBY THE SUMS AND BENEFITS SET FORTH ABOVE.

Release ¶ 15. Stewart had the option to revoke the Release within seven days after it was signed. April 28, 1998 was the last day to reconsider his release. He did not revoke the Release.

Three months after Stewart's employment termination, on July 14, 1998, Cendant made a second public disclosure about the accounting irregularities. This announcement stated that the irregularities were "widespread and systemic and affect[ed] the accounting records of all the major business units of CUC." The company announced that it would restate CUC's annual and quarterly statements for 1995 and 1996 as well as 1997. Following this, Cendant's stock price dropped to $15 ¹¹⁄₁₆ per share. And, in August 1998, Cendant announced that the 1995–1997 financial statements of income would be restated by approximately a $500 million shortfall. In September 1998, Cendant repriced options held by its then employees to approximately $9.00 per share. Stewart's options were not repriced.

Stewart filed his initial complaint in the Connecticut state superior court for damages from Cendant's alleged breach of the stock option agreement and reformation of that agreement. On April 14, 1999, that court issued a temporary injunction restraining Cendant from terminating Stewart's rights under the stock option agreement. On April 29, 1999, plaintiff filed an amended complaint. Cendant then re-

moved the case to the United States District Court, District of Connecticut. On July 6, 1999, that case was transferred to this Court by order of the Judicial Panel on Multidistrict Litigation.

Plaintiff's amended complaint has six counts. Counts I–V seek damages arising out of Cendant's alleged misrepresentations of its financial condition which Stewart claims caused him to agree to an artificially inflated strike price when he exchanged his HFS stock options for Cendant options in December 1997. He also requests the Court to extend the exercise date of the options to "enable the Cendant stock a sufficient time to recover" from the understatements of the company's financial results. In Count VI, plaintiff argues that he "relied upon the truthfulness of management's assurances [that the April 15th discovery would have no long-term effects] and was therefore wrongfully induced to execute the [Release]." Compl. ¶ 44. He requests that the Release either be set aside or reformed to the extent that it "purport[s] to release Cendant for liability for fraud, negligence and/or contract claims with respect to his stock options." Compl. ¶ 50; Pl. Brf. at 5 ("Plaintiff alleges that the release and severance agreement ... should be reformed or set aside because it was induced by Cendant's fraudulent misrepresentations.").

Defendant Cendant Corporation has moved to dismiss the complaint before this Court.[1] Cendant asserts that plaintiff's attempt to circumvent the terms of the Release by arguing that it was fraudulently obtained must fail. For support, Cendant relies on Stewart's recognition that, in executing the Release, he had not relied on any oral or written representations other than those expressly contained in the contract itself. Release ¶ 15 ("HE [Stewart] ACKNOWLEDGES THAT HE IS NOT RELYING ON ANY OTHER REP-

RESENTATIONS, WRITTEN OR ORAL, NOT SET FORTH IN THIS DOCUMENT"). Cendant contents that "because Stewart is bound by the terms of the [Release], he is barred as a matter of law from asserting all of the other claims in the Complaint."

### *Analysis*

#### A. Motion to Dismiss

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the claimant can prove any set of facts consistent with his/her allegations that will entitle him/her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *See Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998); see also 5A Charles A. Wright & Arthur R. Miller, *Federal*

---

1. The motion was originally filed in Connecticut. At the Court's request, the papers were re-filed after the case was transferred.

*Practice & Procedure* § 1357 at 299 (2d ed.1990).

## B. The Release

Plaintiff claims that he was fraudulently induced to sign the Release by the April 16 call and letter (Count VI). As a threshold issue, he requests this Court to either set aside or reform the Release to permit his action to recover for Cendant's alleged breach of the stock option agreement (Counts I–V).[2] Cendant argues that plaintiff's assertion that the Release was fraudulently obtained must fail because plaintiff, in the Release itself, disclaimed reliance on any statement not contained therein. Specifically, Cendant contends that "[d]isclaimers like the one contained in the Agreement and Release expressly and conclusively negate the element of reliance [for a fraud claim] because there can be no reliance on oral or written representations that are not expressly included in the release." Def. Brf. at 9. Plaintiff counters that Connecticut law does not recognize the validity of any contract obtained by fraud even if the contract contains language disclaiming reliance on written or oral representations made outside the four corners of the document.

■ As a general rule, in Connecticut, "[p]arties are free to bargain for disclaimer clauses in a contract ... [and] a clause disclaiming reliance by the buyer on the seller's representations is a valid contract term." *Gibson v. Capano*, 241 Conn. 725, 699 A.2d 68 (1997). This rule is counterbalanced by the proposition that "in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, *unless the contract is voidable on grounds such as mistake, fraud or unconscionability.*" *Holly Hill Holdings v. Lowman*, 226 Conn. 748, 628 A.2d 1298 (1993) (emphasis added).

New York has developed a rule that where the release agreement contains a disclaimer clause in which the releasor expressly disclaims reliance upon any representations made outside the four corners of the agreement, the clause prevents the releasor from challenging the release as procured by fraud. *See Fonseca v. Columbia Gas Sys., Inc.*, 37 F.Supp.2d 214, 229 (W.D.N.Y.1998). Connecticut courts appear to agree with this holding under some circumstances. *See Gibson*, 699 A.2d 68 at 72; *see also Holly Hill Holdings*, 628 A.2d at 1299. In *Gibson*, the Connecticut Supreme Court upheld the validity of a release agreement which contained a disclaimer that "neither the Seller, nor any representative of the Seller has made any representation upon which the Buyer relies with respect to the condition of the property covered by the agreement, except as hereinbefore expressly set forth," where the buyer had alleged that they "were induced into entering the contract by the defendant's [oral] misrepresentations." *Id.* at 71.

■ *Gibson*, however, was later limited to circumstances where the releasor alleged that the agreement was obtained through *innocent* misrepresentation. *See Khan v. Danse*, No. 542447, 1998 WL 910230, at *1 (Conn.Super.Ct. Dec. 18, 1998) (emphasis added). The *Khan* court held that, despite the general rule that courts should enforce disclaimer clauses, an "as is" disclaimer did not preclude the releasor's assertion that the agreement had been obtained through fraudulent misrepresentation. The court observed, "where a claim of fraudulent misrepresentation is involved rather than an innocent misrepresentation, the holdings of *Holly Hill* and *Gibson* are inapposite." *Id.; see also Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987) (integration clause in contract is no bar to a claim that its accep-

---

**2.** Plaintiff seeks to have the release reformed to eliminate all provisions that "purport to release Cendant for liability from fraud, negligence and/or contract claims with respect to his stock options." Compl. ¶ 22.

tance had been procured by fraud); *Warman v. Delaney*, 148 Conn. 469, 172 A.2d 188 (1961) (purchaser's claim that contract to sell property had been induced by negligent misrepresentations not barred by disclaimer of reliance upon external representations); *Foley v. Huntington Co.*, 42 Conn.App. 712, 682 A.2d 1026 (1996) (reckless misrepresentation as to boundaries of land supports award of damages even if contract disclaims representations of seller as to condition of land). Thus, under Connecticut law, Stewart may maintain his action despite the disclaimer if he has otherwise successfully alleged that the Release was fraudulently obtained.

Defendant attempts to distinguish these Connecticut cases which hold that allegations of fraud in the inducement can overcome a disclaimer of reliance by maintaining that they do not address situations where the plaintiff was aware of the circumstances underlying the representations. For example, the *Gibson* court enforced plaintiff's disclaimed reliance upon a seller's representations and declared "where a party realizes he has only limited information upon the subject of a contract, but treats that knowledge as sufficient in making the contract he is deemed to have assumed the risk of a mistake." 699 A.2d at 73; *see also Holly Hill Holdings*, 628 A.2d at 1299 (claim for misrepresentation rejected where plaintiff was aware of property's earlier use before purchasing under an "as is" contract). Here, plaintiff knew about the accounting irregularities and the corresponding 50% drop in Cendant's stock the day before he agreed to sign the Release. Cendant's argument, however, does not negate the circumstance that the plaintiffs in *Gibson* and *Holly Hill Holdings* had not alleged fraud by the defendant seller. The court finds that if plaintiff has otherwise successfully plead a claim for fraud with regard to the signing of the Release, the defendant cannot use the disclaimer to rebut his claim of reliance upon the April 16 statements.

## C. Fraud

■ The next issue to be decided is whether plaintiff has plead the elements of fraud under Connecticut law: (1) a false representation as to a statement of fact, (2) which was untrue and known by the maker to be untrue, (3) that was made to induce the plaintiff to act, and (4) was relied upon by the plaintiff to his detriment. *See Weisman v. Kaspar*, 233 Conn. 531, 661 A.2d 530 (1995); *Maturo v. Gerard*, 196 Conn. 584, 494 A.2d 1199 (1985); *Miller v. Appleby*, 183 Conn. 51, 438 A.2d 811 (1981). As stated, Defendant may not use plaintiff's disclaimer in paragraph 15 of the Release to rebut plaintiff's charge that he relied on the April 16 letter and call. Further, if plaintiff has successfully plead that the release was obtained by fraud, the Release may be set aside. It would follow, then, that his remaining claims cannot be dismissed.

■ Stewart asserts that his agreement to the release was tainted by Cendant's fraudulent misrepresentations. Specifically, he declares that the statements in the April 16 call and letter "omitted or concealed adverse facts concerning the extent and seriousness of the accounting irregularities." Pl. Brf. at 4. The crux of the alleged fraud is Stewart's assertion that at the time of his termination, he "did not know that he would have a claim for destruction of [the stock option's] value because ... what was described by Cendant at the that time as 'limited' and 'potential accounting irregularities' [were] only months later disclosed as widespread accounting fraud." He "relied upon the truthfulness of [the] statements when he executed the Agreement and General Release" that "the accounting irregularities ... would not materially affect Cendant." *Id.* Essentially, then, plaintiff asserts that he signed away his right to sue on the option agreement because of assurances that he would never have reason to sue: the April 16 statements led Stewart to believe that his stock options still had value.

Yet, Stewart admits that when he signed the Release on April 17, 1999, he never intended that the Release would bar claims arising out of his stock option agreement. Stewart Aff. ¶ 15. ("At the time I signed the Release and Termination Agreement *I had no intention of releasing Cendant from any claims related to my stock option agreement ....*") (emphasis added). Plaintiff's brief repeats this admission. Pl. Brf. at 6 ("When he signed his severance agreement, Greg Stewart had no intention of releasing Cendant from any claims relating to his stock option agreement....."). Plaintiff's assertion that he relied upon Cendant's April 16th letter and call cannot be squared with these admissions. Plaintiff's admitted unilateral mistake about the scope of the Release belies his contention that Cendant's representations about the company's future induced him to execute the Release. Compl. ¶ 49.

This absolute disconnect between the allegedly fraudulent statements and the signing of the Release is fatal to plaintiff's claim that the Release was procured by fraud because the element of detrimental reliance cannot be established. The Court cannot set aside the Release.

### D. Reformation

■ Plaintiff cannot demonstrate that the release was fraudulently induced. That said, plaintiff requests the Court to reform the otherwise enforceable release to eliminate all provisions that "purport to release Cendant for liability from fraud, negligence and/or contract claims with respect to his stock options." Compl. ¶ 22. A court has the equitable power to reform a contract because of either mutual mistake or unilateral mistake coupled with fraudulent or inequitable conduct. *See generally Lopinto v. Haines,* 185 Conn. 527, 533–34, 441 A.2d 151 (1981). Here, plaintiff asserts that his "assent to the Agreement and General release was secured as a result of a unilateral mistake on his part as to the true facts concerning the accounting regularities ... coupled with

inequitable conduct and/or fraud on the part of Cendant." As said, plaintiff's allegation that the Release was procured by fraud cannot be sustained, but if plaintiff has sufficiently plead "inequitable conduct" on Cendant's part, his request to reform the Release should not be dismissed.

■ "Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement." *Id.* at 531–32, 441 A.2d 151. The inequitable conduct necessary to reform an agreement occurs when "unknown to one of the parties, an instrument contains a mistake rendering it at variance with the prior understanding and agreement of the parties, and the other party learns of this mistake at the time of the execution of the instrument and later seeks to take advantage of it." *Home Owners' Loan Corp. v. Stevens,* 120 Conn. 6, 179 A. 330, 332 (1935), *cited in Lopinto,* 185 Conn. at 535, 441 A.2d 151; *see also Spirt v. Albert,* 109 Conn. 292, 146 A. 717, 720 (1929). The primary reason to reform in the case of unilateral mistake, therefore, is to prevent the other party from taking "unfair advantage" of the mistaken party.

Here, plaintiff alleges that he made a unilateral mistake about the coverage of the Release, *see* Stewart Aff. ¶ 15. ("At the time I signed the Release and Termination Agreement I had no intention of releasing Cendant from any claims related to my stock option agreement...." ). He, however, fails to state how Cendant (1) knew of his mistake about the coverage of the Release and (2) took advantage of the mistake. And, absent a demonstrable relationship between Cendant's alleged inequitable conduct and plaintiff's unilateral mistake, this Court cannot reform the release. Plaintiff has not alleged that defendant misrepresented the scope of the Release or concealed any information that would have led plaintiff to mistakenly conclude that the Release did not bar actions on the option agreement. Because this Court finds that plaintiff's unilateral mis-

take was in no way connected to defendant's allegedly wrongful conduct of April 15–16, the Release cannot be reformed.

### E. Unforeseeable Claims

██ Plaintiff also seeks to limit the reach of the release by arguing that "to the extent that the agreement purports to release future or unknown claims not within the contemplation of the parties, the agreement is unenforceable." Defendant counters that by its terms, the Release bars all actions which Stewart "may now have or hereafter can, shall or may have against [Cendant], including all *unknown, undisclosed and unanticipated* losses, wrongs, injuries, debts, claims or damages...." Release ¶ 5 (emphasis added).

██ Connecticut holds that "[e]xcept in very rare instances, the settlement and release of a claim does not cover claims based on events that have not yet occurred." *See Muldoon v. Homestead Insulation Co.*, 231 Conn. 469, 650 A.2d 1240, 1245 (1994). Hence, language which addresses future or unknown claims is "ordinarily construed to cover only inchoate claims that are in being at the time of the release, but which have not yet manifested themselves." *Id.; see also Duni v. United Techs. Corp.*, 239 Conn. 19, 682 A.2d 99, 104 (1996). So, the issue is whether Stewart's claims for violation of the stock option agreement were "in being" as of the signing of the Release on April 17, 1998 or by April 28, 1998 (the last date for Stewart to have revoked the Release).

Both sides acknowledge that between April 15 and April 17, 1998 the price of Cendant stock dropped precipitously. Plaintiff, however, argues that "it was only during the July–August 1998 time frame when [he] began to appreciate that, perhaps, his options had been rendered worthless." Pl. Brf. at 15. Plaintiff also relies on this Court's ruling of July 27, 1999, which he argues found that those who purchased securities between April 15, 1998 and August 27, 1998 had a viable securities fraud claim based on inaccuracies and omissions in Cendant's April 15, 1998 release. *See* 1999 WL 549015, at *17–18 (July 27, 1999). In reply, Cendant maintains that: (1) Stewart recognized that between April 16–27 the stock was trading at or below the strike price; and (2) he admitted that when he signed the release, he knew he had potential claims against Cendant. Def. Rep. at 4 (citing Stewart's statement that, at signing, he "had no intention of releasing Cendant from any claims relating to his stock option agreement").

In July 1999, the Court refused to dismiss § 10(b) claims asserted against HFS directors by plaintiffs who purchased Cendant securities after April 15, 1998 based upon Cendant's April 15 press release and subsequently released financial reports and earnings statements. *See* 1999 WL 549015, at *17–18. Stewart, however, did not acquire his Cendant stock options[3] on or after April 15, 1999. His HFS options were converted into Cendant options by the December 1997 HFS/CUC merger and he now seeks to recover for the "artificially inflated strike price" set then (Counts I–V). On April 16, 1998, the day before plaintiff signed the Release, Cendant shares were trading approximately $4.00 below plaintiff's strike price. To the extent that Stewart had any claims against Cendant concerning the value of his options, these claims were "in being" as of Cendant's April 15th disclosure. While Cendant's subsequent disclosures, on July 14 and August 28, 1998, may have caused the stock to drop further, such did not cause new injuries to this plaintiff under the option agreement. *Cf., e.g., Muldoon*

---

**3.** Stock options are securities. *See* 15 U.S.C. § 78(c)(10) (defining "security" as an "option, privilege or any security"); *see also generally Silverman v. Ernst & Young LLP*, No. 99–856, slip op. at 6 (D.N.J. Aug. 3, 1999)

(denying Ernst & Young LLP's motion to dismiss federal securities law claims brought by former HFS directors/current Cendant directors who hold Cendant stock options).

*v. Homestead Insulation Co.*, 231 Conn. 469, 650 A.2d 1240, 1245 (1994) (permitting claims despite general release where worker's compensation plaintiff suffered a "new injury" and not a "recurrence or exacerbation of the old injury"). Moreover, plaintiff has recognized he had potential claims arising out of the stock option agreement on the day that he signed the Release.[4] The Court concludes that the Release encompasses all of Stewart's claims related to his stock option agreement.

### Conclusion

For the reasons stated, the Court dismisses with prejudice Count VI of plaintiff's complaint, which seeks reformation of the April 17, 1998 Release. Because that Release bars any and all actions by plaintiff related to defendant's alleged breach of the stock option agreement, plaintiff's remaining claims are dismissed with prejudice.

### ORDER

This matter is before the Court on the motion of Cendant Corporation ("Cendant") to dismiss plaintiff Gregory Stewart's complaint. Having heard oral argument on November 1, 1999, having considered the submissions of the parties, and for good cause shown,

It is on this day of November, 1999,

ORDERED that Cendant's motion to dismiss is granted.

---

4. In its July opinion, the Court had also concluded that "Cendant's language [in the April 15 announcement] about other [previously issued] financial reports was sufficient to alert the average, prudent investor of possible irregularities." *See* 1999 WL 549015 at *19.